UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------- X

AL FOGEL,

                Petitioner,

    -against-

WILLIAM LEE,

                Respondent.

----------------------------------------------------------------- X



FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ NOV 2 6 2013 ★

BROOKLYN OFFICE

13-CV-2297 (ARR)

NOT FOR ELECTRONIC
OR PRINT PUBLICATION

OPINION AND ORDER

ROSS, United States District Judge:

    Al Fogel ("petitioner"), appearing pro se, filed the instant petition, dated April 3, 2013[1],

for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In challenging his criminal conviction,

he claims that (1) the prosecutor's failure to disclose certain evidence violated his due process

rights under Brady v. Maryland, 373 U.S. 83 (1963); (2) the state court's decision to grant the

prosecutor's reverse-Batson application as to one of the jurors at his trial violated petitioner's

federal constitutional rights; and (3) his appellate counsel was ineffective. For the reasons stated

below, petitioner's application is denied.

---

[1] The petition is considered filed on April 5, 2013, which is the date on which petitioner deposited it in the prison mail system. See Noble v. Kelly, 246 F.3d 93, 97-98 (2d Cir. 2001) (applying the "prison mailbox rule" to petitions for writs of habeas corpus); Rule 3(d) of the Rules Governing Section 2254 Cases in the United States District Courts (2010) ("A paper filed by an inmate confined in an institution is timely if deposited in the institution's internal mailing system on or before the last day for filing."). Although this court initially expressed concerns about the timeliness of the petition and directed petitioner to submit an affidavit showing why his petition should not be time barred, see Dkt. No. 5, the respondent failed to raise timeliness in its response, despite this court having explicitly directed it to do so in an order to show cause, see Dkt. No. 8. Accordingly, the court considers the petition on the merits. See Wood v. Milyard, 132 S. Ct. 1826, 1834-35 (2012) (finding that state waived statute of limitations defense by informing court it would not challenge, but did not concede, petition's timeliness); Day v. McDonough, 547 U.S. 198, 209 (2006) (holding that district courts are permitted, but not obliged, to consider timeliness sua sponte).

# BACKGROUND

## A.    Petitioner's State Court Trial

At the conclusion of his 2005 jury trial in the Supreme Court of the State of New York, Queens County ("New York Supreme Court"), petitioner was convicted of Manslaughter in the First Degree (N.Y. Penal Law § 125.20[1]), Criminal Possession of a Weapon in the Second Degree (N.Y. Penal Law § 265.03[2]), and Criminal Possession of a Weapon in the Third Degree (N.Y. Penal Law § 265.02[4]).[2] Tr. 1753; Aff. of William H. Branigan in Opp'n to Pet. ("Branigan Aff.") ¶ 18. Petitioner's conviction related to the death of David Chandler, who was shot in the stomach while in the courtyard of the Queensbridge Houses during the wee hours of the morning on August 23, 2001. Branigan Aff. ¶ 4. Because of the lengthy and complicated nature of the state court proceedings, the court assumes the parties' familiarity with the facts underlying the petition and summarizes only the relevant aspects here.

### *Challenge to Defense Counsel's Use of Peremptory Strikes in Jury Selection*

During jury selection, the prosecutor made a reverse-Batson[3] challenge to defense counsel's use of peremptory strikes and alleged that defense counsel was discriminating against white prospective jurors. Tr. 280-83. The trial judge found that the prosecutor had made out a prima facie case of discrimination, and defense counsel provided a race-neutral explanation, which was that he had a policy of striking prospective jurors with prior jury service. Id. at 284-85. The trial judge found that this stated facially-neutral reason was pretextual as to one of the prospective jurors and seated that juror in petitioner's case. Id. at 286-87.

---

[2] On October 3, 2005, petitioner was sentenced to concurrent indeterminate prison terms of from twenty-two years to life for the first-degree manslaughter count, from sixteen years to life for the second-degree weapons count, and from twelve years to life for the third-degree weapons count. Branigan Aff. ¶ 18.s

[3] See Batson v. Kentucky, 476 U.S. 79 (1986) (holding that Equal Protection Clause forbids prosecutors from challenging potential jurors solely on the grounds of race). The prosecutor in petitioner's case referred to the analogous state-law case, People v. Kern, 554 N.E.2d 1235 (N.Y. 1990).

### *Witness Testimony at Trial*

At trial, the government's key eyewitness was Monique McLeod, a resident of the Queensbridge Houses at the time of the shooting. Id. at 730. McLeod testified that, during the day on August 22, 2001, she saw petitioner's sister arguing with David Chandler. Id. at 733-37. She also testified that around 3:00 a.m. on August 23, she saw petitioner, his sister, and Chandler in the courtyard. Id. at 760-62. According to McLeod, petitioner pulled a "black gun" out of his pocket, put his arm around Chandler, and shot him in the stomach at close range. Id. at 763-65.

Although defense counsel requested all Brady material in a pre-trial discovery motion, see People v. Fogel, No. 2319-02, Feb. 2008 Mot. to Vacate J. pursuant to N.Y. C.P.L. § 440.10(1) ("Feb. 2008 Mot."), Ex. B, the prosecution did not inform defense counsel until shortly before opening statements that the Queens District Attorney's ("DA") office had provided McLeod with housing relocation assistance. Tr. 567-68. The DA confirmed that McLeod had received such assistance after she received threats from persons warning her not to testify at petitioner's trial. Id. at 567-76.

After opening statements, the prosecutor disclosed that he had subsequently learned that McLeod had received additional benefits, including "meal money, rent, travel and moving expenses." Id. at 649-51. As a result of this disclosure, the trial judge held a hearing and heard testimony from McLeod and from a detective involved in coordinating witness benefits. Id. at 663-78, 695-721. At the hearing, McLeod admitted that she first discussed the petitioner's case with the police on August 30, 2001, while in custody following her arrest on a marijuana charge. Id. at 667. She also admitted that, when she returned to court on the date listed on her summons for that charge, she learned that the charge had been "thrown out and dismissed." Id. at 665-66. When questioned, she insisted that neither the DA's office nor the police had promised her

3

anything in relation to that summons or to the five-year probationary sentence she was then serving for a prior drug conviction. Id. at 666, 670-71. As to the dismissal of the marijuana possession charge, the Assistant DA prosecuting petitioner's case stated prior to the hearing, "What happened, I don't just know." Id. at 656.

During cross-examination of McLeod at petitioner's trial, defense counsel attacked McLeod's credibility through questioning about her prior felony conviction, id. at 783-90, her marijuana use around the time of the relevant events, id. at 801-08, 868, her prior inconsistent statements before the grand jury, id. at 878-79, 909-14, and the benefits she received from the DA's office, id. at 975-1007, 1091-95, 1106-12. When asked, McLeod stated that she did not receive any other assistance beyond the elaborated benefits from the DA's office. Id. at 1093-94. Defense counsel also attempted to establish that McLeod had motive to testify falsely. Defense counsel questioned her about whether, at the time she first spoke to police, she was worried that the summons she had been issued in connection with her marijuana arrest would result in a violation of her probation and that a violation of her probation might result in jail time. Id. at 790-800, 819-222, 840-41, 1096-97, 1120-21. She testified that, when she went back to court on the date listed on the summons issued in connection with that arrest, she was informed that there was no record of her arrest. Id. at 782-83. Shortly thereafter, she received a letter from the Queens DA stating that the charge had been dismissed. Id. at 783.

On redirect examination, McLeod confirmed that, in connection with her August 30 marijuana arrest, the police told her that the summons she had received could result in her being violated on her probation. Id. at 1096. However, McLeod insisted that she did not ask the police for any assistance with respect to her potential violation. Id. The prosecutor engaged McLeod in the following exchange:

4

Q    Did you ask the police for help with respect to [the probation violation]?

A    No. Because I got violated any way. I did 30 days in jail behind that
     Summons.

Q    Did you get violation on your Probation?

A    Yes, I did.

Q    Was it in relations to that Summons?

A    Yes, it was.

. . .

Q    Did the Assistant District Attorney help you in any way?

A    No.

Q    What were the results of the Probation violation? What happened to you?

A    I did 30 days on Rikers Island, and after that, I was court mandated to a
     drug treatment program for eight months.

Id. at 1096-97.

Relying on his extensive cross-examination of McLeod, defense counsel argued in his

summation that she lacked credibility, most importantly because, as she sat in the interview room

at the police precinct after her August 30 marijuana arrest, she had a motive to make statements

against petitioner and cooperate with police in hopes of avoiding jail time. Id. at 1596-99, 1606-

09, 1614-16. He argued that whether McLeod received any actual assistance with her probation

violation was irrelevant because what mattered was her state of mind "as she was sitting in that

room terrified that she was going to go to jail" when she decided to accuse petitioner. Id. at 1614.

Defense counsel argued to the jury, "Now the witness had testified she didn't get a benefit

regarding her violation of probation. But she didn't know that. She didn't know what benefit she

was going to get or not going to get." Id. at 1614.

In response to defense counsel's attack on McLeod's credibility, the prosecutor reiterated in his summation that McLeod had received no benefits with regards to the violation of her probation. Id. at 1628-31. Referring to her testimony, he stated, "She got violated on that probation. She served thirty days for that probation." Id. at 1628.

In addition to McLeod, the prosecution called as witnesses four current or retired law enforcement agents, a paramedic, a medical examiner, and a man named Karl Oglesby, who testified that he knew petitioner by the name "Justin Clark" from when they lived at the same apartment complex in South Carolina. Id. at 1250. Oglesby testified that, at one point, petitioner said that "he was drinking beer with a guy, and he was making everything seem like it was all good, and he turned around and shot him." Id. at 1258. He testified that, at another point, petitioner showed him a news article stating that petitioner was wanted in connection with a murder and confirmed to Oglesby that he had committed the murder. Id. at 1262-65.

Defense counsel called two witnesses to testify on petitioner's behalf. The first, Nakita Gilbert, was a long-time friend of petitioner's sister who testified that, after hearing a gunshot on the night of the murder, she went to her window and saw another man, who was not the petitioner, leaving the scene. Id. at 1472-1512. The second witness, Carlos Ayala, a long-time friend of petitioner, testified that he was hanging out with petitioner outside Ayala's home on the night of the murder. Id. at 1538-42. Both of these witnesses admitted that they had not come forward with information until long after learning of petitioner's arrest.

## B.    Post-Conviction Proceedings

### Petitioner's February 2008 N.Y. C.P.L. § 440.10 Motion

In February 2008, petitioner, through new appellate counsel, filed a motion to vacate his

conviction pursuant to New York State Criminal Procedure Law (N.Y. C.P.L.) § 440.10. After

petitioner's conviction, he discovered a letter, dated June 14, 2002 (the "McLeod Letter"), in

which an Assistant DA, who was involved with his case around that time, explained to the judge

overseeing McLeod's probation that McLeod had tested positive for tuberculosis and would be

able to comply with her obligation to enroll in a drug treatment program after she received

another test for that disease.[4] Feb. 2008 Mot., Ex. D. Petitioner's appellate counsel argued that

the McLeod Letter was <u>Brady</u> material that should have been disclosed and that petitioner's due

process right to a fair trial was violated because he was not able to attack the credibility of the

prosecution's star witness using the letter. Mem. of Law in Supp. of Feb. 2008 Mot., at 9-12.

According to petitioner, unlike the other benefits on which McLeod was cross-examined, the

McLeod Letter did not relate to threats against her but instead provided evidence for the

defense's theory that McLeod had lied in hopes of leniency. <u>Id.</u> at 12-13.

    Appellate counsel argued that the due process violation was further exacerbated by the

---

[4] The letter read:

Dear Judge Wong:

    I am writing this letter on behalf of Miss Makeisha McLeod, a witness in a matter which I
am investigating. Miss McLeod is scheduled to appear before you on June 19, 2002 to present
proof the she has enrolled in a new drug rehabilitation program.

    In an attempt to comply with this Court's condition of probation, Miss McLeod has
informed me that on June 3, 2002 she received a physical examination by her primary doctor. On
June 6, 2002, Miss McLeod obtained the results of her examination and tested positive for
tuberculosis. She was then referred by her primary doctor to have further chest examinations.
Miss McLeod was informed that she would receive the results of her chest examinations on June
25, 2002. Miss McLeod has further informed me that upon receipt of the results of her
examination, she will be able to enroll into the Narco Freedom Friends and Family Drug
Rehabilitation Center located at 528 Morris Avenue, Bronx, New York, 10451.

                                                          Respectfully submitted,

                                                          Kim Peterson
                                                          Assistant District Attorney

Feb. 2008 Mot., Ex. D. McLeod has used, alternatively, the first names "Makeisha" and "Monique" for
legal purposes.

uncorrected statements at trial that no other benefits were received and that McLeod served jail time for a probation violation connected with her August 30 arrest. Id. at 12. Appellate counsel referred to materials in a court file connected with McLeod's probationary sentence. Aff. of Jonathan Garelick in Supp. of Feb. 2008 Mot. ("Garelick Aff."), ¶ 103 & Ex. F. Those materials did not indicate that McLeod had ever been found to be in violation of her probation based on her August 30, 2001, marijuana arrest, as she had claimed. Id. Instead, the file showed that a "Declaration of Delinquency" had been issued against McLeod in November 2001 because of her failure to report to her probation officer in the months prior to her August 30 arrest. Id. Relying on these documents, appellate counsel argued, "[I]t appears that contrary to the testimony elicited by the prosecutor at trial, McLeod was never violated on her probation based on the August 30, 2001 arrest. . . . Where the inaccurate testimony was elicited in an effort to rebut the defense theory that McLeod cooperated in an effort to avoid a probation violation based on her new arrest, the eliciting o[f] inaccurate testimony and the prosecutor's failure to correct that testimony exacerbated the harm from the undisclosed Brady material." Id. ¶ 105.

Appellate counsel contended that, not only was the McLeod Letter subject to the disclosure requirement, but there was a reasonable probability that had the letter been available at trial petitioner would not have been convicted. Mem. of Law in Supp. of Feb. 2008 Mot. at 14. Given the centrality of McLeod's credibility to the trial, he urged the state court to find that the result at trial was significantly impacted by the denial of this important potential avenue for impeachment, combined with the uncorrected misstatements that were used to counter the defense's attack on McLeod's motives to cooperate. Id. at 14-20.

On September 18, 2008, the New York Supreme Court (Lewis, J.) denied without hearing petitioner's motion on the grounds that, although the McLeod Letter was "clearly Brady as it

affected the credibility of the witness," petitioner had failed to show that there was "a reasonable probability that the outcome of the trial was affected" by the prosecution's failure to hand over the letter. People v. Fogel, No. 2319/02, Short Form Order (N.Y. Sup. Ct. Sept. 18, 2008). Judge Lewis noted that McLeod had been extensively cross-examined at trial and that the letter did not make a request but only informed the judge of the witness's medical condition. Id.

### Petitioner's Appeal

On direct appeal of petitioner's conviction, appellate counsel argued that the trial judge had erred by improperly holding that trial counsel's reason for striking a juror was pretextual. See July 2009 Br. for Def.-Appellant ("July 2009 Br."), at 55-61. Petitioner also appealed the order denying his N.Y. C.P.L. § 440.10 motion regarding the Brady violation. Id. at 62-88.

On May 4, 2010, the Appellate Division, Second Department ("Appellate Division"), affirmed petitioner's conviction and denial of his N.Y. C.P.L. § 440.10 motion. People v. Fogel, 899 N.Y.S.2d 655 (Mem) (App. Div. 2010). First, the Appellate Division held that the trial judge had not erred in granting the reverse-Batson application and deferred to the trial judge's determination that the defense's proffered explanation was pretextual. Second, it agreed with the lower court that there was "no reasonable possibility that disclosure of the subject material would have affected the outcome of the trial." The New York Court of Appeals denied leave to appeal, People v. Fogel, 934 N.E.2d 898 (N.Y. 2010), as well as petitioner's subsequent request to reconsider his application for leave to appeal, People v. Fogel, 942 N.E.2d 323 (N.Y. 2010).

### Petitioner's Motion for Leave to Renew

On April 25, 2011, petitioner filed a motion for leave to renew his previously denied N.Y. C.P.L. § 440.10 motion alleging Brady violations. The New York Supreme Court (Lewis, J.) denied the motion on the grounds that the issues raised had previously been determined on the

merits on appeal. People v. Fogel, No. 2319/02, Short Form Order (N.Y. Sup. Ct. June 16, 2011). The Appellate Division denied leave to appeal Judge Lewis's decision. Branigan Aff. ¶ 32.

### *Petitioner's Motion for a Writ of Error Coram Nobis*

In July 2012, petitioner moved the Appellate Division for a writ of error coram nobis on the grounds that his appellate counsel was ineffective both on his direct appeal and in the litigation of his N.Y. C.P.L. § 440.10 motion. Id. ¶ 33. The Appellate Division held that petitioner failed to establish that he was denied effective assistance of counsel, People v. Fogel, 954 N.Y.S.2d 477 (Mem.) (App. Div. 2012), and leave to appeal this decision was also denied, People v. Fogel, 988 N.E.2d 532 (N.Y. 2013).

### C.    The Instant Petition for a Writ of Habeas Corpus

In his petition before this court, petitioner argues three principal grounds for habeas relief.[5] First, he argues that the prosecution's failure to disclose the McLeod Letter was a Brady violation, which was exacerbated by the uncorrected testimony at trial and which requires reversal. Second, he argues that his constitutional rights were violated because the trial judge erred in rejecting as pretextual defense counsel's explanation that he had struck a juror based on prior jury service. Third, he argues that he was denied his Sixth Amendment right to effective assistance of appellate counsel because appellate counsel failed to raise certain claims on appeal and in petitioner's N.Y. C.P.L. § 440.10 motion.

---

[5] In July 2012, petitioner filed a N.Y. C.P.L. § 440.20 motion to set aside his sentence on the grounds that (1) his sentence was improperly enhanced based on the incorrect assumption that he had previously been convicted of Criminal Possession of a Weapon in the Third Degree, rather than Attempted Criminal Possession of a Weapon in the Third Degree, and (2) that his counsel was ineffective at sentencing. See Notice of Mot. to Set Aside Sentence C.P.L. §440.20, dated July 13, 2012. The New York Supreme Court (Buchter, J.) found petitioner's motion meritless, as the alleged error had no impact on the underlying theory for his sentencing (to wit, that he had two prior violent felonies). People v. Fogel, No. 2319/02, Short Form Order (N.Y. Sup. Ct. Mar. 26, 2013). After filing the instant petition, petitioner filed a letter, dated May 9, 2013, in which he requested this court to hold his petition in abeyance pending the outcome of his application in state court for leave to appeal the denial of his N.Y. C.P.L. § 440.20 motion. Dkt. #6. Petitioner asked the court to hold his petition in abeyance so that he could exhaust his state-law remedies on this claim, which was not included in his original petition. The application for leave to appeal has since been denied, Branigan Aff. ¶ 40, but petitioner has not sought to amend his habeas petition to add this new claim and did not raise it in his reply. Therefore, the court will not consider it.

## DISCUSSION

### A.    Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") establishes a

deferential standard that federal habeas courts must apply when reviewing state court

convictions. 28 U.S.C. § 2254(d). The statute provides, in pertinent part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

Id. The statutory language "clearly established Federal law, as determined by the Supreme Court

of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's

decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362,

412 (2000). A state court decision is "contrary to" clearly established Supreme Court precedent

if "the state court applies a rule that contradicts" Supreme Court precedent or if "the state court

confronts a set of facts that are materially indistinguishable from a decision of [the Supreme]

Court and nevertheless arrives at a result different from [that] precedent." Id. at 405-06. With

respect to the "unreasonable application" clause, "a federal habeas court . . . should ask whether

the state court's application of clearly established federal law was objectively unreasonable." Id.

at 409. "Where a state court's decision is unaccompanied by an explanation, the habeas

petitioner's burden still must be met by showing there was no reasonable basis for the state court

to deny relief." Harrington v. Richter, 131 S. Ct. 770, 784 (2011).

## B.    Petitioner's *Brady* Claim

"There are three components of a true <u>Brady</u> violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999); <u>see also</u> <u>Moore v. Illinois,</u> 408 U.S. 786, 794-95 (1972) (relating standard for <u>Brady</u> violation); <u>Giglio v. United States,</u> 405 U.S. 150, 154 (1972) (applying <u>Brady</u> rule to impeachment material). Petitioner argues that the prosecutor's failure to disclose the McLeod Letter violated <u>Brady</u> and deprived him of due process and a fair trial. In this regard, he contends that "the letter was a benefit conferred on McLeod that assisted her in avoiding a probation violation," and thus was essential to "properly assess[] McLeod's credibility related to any motive she may have had to cooperate." Pet. 23. Furthermore, petitioner argues that this violation was exacerbated by the prosecution's "elicitation of false testimony from McLeod that she served 30 days in jail on a probation violation in connection with her August 30, 2001 arrest for possession of marijuana, to rebut Petitioner's claim that she was testifying to avoid such a violation." <u>Id.</u> at 24. According to petitioner, there is a reasonable probability that the case would have concluded differently had the prosecution handed over the McLeod Letter. <u>Id.</u>

Although Judge Lewis of the New York Supreme Court noted, somewhat ingenuously, that the McLeod Letter was merely informational in character (<u>i.e.,</u> it made no requests on McLeod's behalf), he found that it was "clearly <u>Brady</u> as it affected the credibility of the witness." Short Form Order (N.Y. Sup. Ct. Sept. 18, 2008). Nonetheless, applying the "materiality" standard for prejudice developed in <u>United States v. Agurs,</u> 427 U.S. 97 (1976), and <u>United States v. Bagley,</u> 473 U.S. 667 (1985), Judge Lewis held that there was not "a

12

reasonable probability that the outcome of the trial was affected by the failure of the People to hand over the letter." Judge Lewis's determination, affirmed by the Appellate Division, that Brady was not violated was not objectively unreasonable. Petitioner has not shown that the undisclosed letter "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles v. Whitley, 514 U.S. 419, 435 (1995).

"Suppressed evidence is not material when it 'merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable.'" United States v. Amiel, 95 F.3d 135, 145 (2d Cir. 1996) (quoting United States v. Wong, 78 F.3d 73, 79 (2d Cir. 1996) (internal quotations omitted)); see also Mack v. Conway, 476 F. App'x 873, 876-77 (2d Cir. 2012). This is particularly so where there is additional corroborating evidence for the witness's testimony, such as Oglesby's testimony here, and where ample evidence has been introduced to show the witness's propensity and motive to lie. See United States v. Petrillo, 821 F.2d 85, 89-90 (2d Cir. 1987). McLeod's credibility was thoroughly impeached at trial when she was confronted with her prior felony conviction, the benefits received from the DA's office, and her prior contradictory statements to police and before the grand jury. Because defense counsel had already thoroughly explored McLeod's motive to lie to avoid jail time for her probation violation, it was not unreasonable for the state court to conclude that any cross-examination into the equivocal assistance provided by the Assistant DA's letter would have been merely "cumulative." See United States v. Locascio, 6 F.3d 924, 949 (2d Cir. 1993). What is more, the documents in McLeod's probation file do not unambiguously rebut McLeod's statement that she was violated on her probation as a result of the August 30 marijuana arrest. It would not have been unreasonable for the state court to conclude that there was only a minimal probability that the inability to attack McLeod's statements on this front

impacted the trial outcome, particularly in light of the fact that defense counsel attacked her credibility by arguing that she hoped to get help with her violation, not that she actually ever did. Thus, although the prosecutor's failure to hand over the McLeod Letter is indeed troubling, the state court's ruling was not unreasonable.

## C.    Reverse-*Batson* Claim

Next, petitioner argues that the state trial judge erred in finding that defense counsel's proffered race-neutral explanation for a peremptory strike was pretextual. Petitioner argues that (a) counsel consistently challenged jurors on the basis of prior jury service and (b) there was no evidence that this reason was pretextual. Pet. 36. Petitioner urges this court to find that "the court's order seating the juror deprived Petitioner of his statutory right to exercise peremptory challenges and his constitutional right to be tried by a jury in whose selection he had a voice." Id. The Appellate Division determined that the trial judge's ruling on the reverse-Batson challenge was not in error. People v. Fogel, 899 N.Y.S.2d 655 (Mem) (App. Div. 2010). Because the right to peremptory challenges in state court is a creature of state rather than federal constitutional law, a state court's determination that such a ruling did not involve an error warranting reversal will not be overturned in federal court so long as all seated jurors are qualified and unbiased. See Rivera v. Illinois, 556 U.S. 148 (2009) (finding that Fourteenth Amendment did not require U.S. Supreme Court to overturn state appellate court's determination that error as to peremptory strike ruling did not require reversal of conviction). Because petitioner does not state a basis on which a juror could have been challenged for cause or contend that a juror was in fact biased against him, he has not presented this court with a claim for relief based on a cognizable federal right.

## D.    Ineffective Assistance of Appellate Counsel

To establish a violation of the Sixth Amendment right to effective assistance of counsel,

petitioner must meet the two-prong test established by Strickland v. Washington, 466 U.S. 668 (1984). First, petitioner must demonstrate that counsel's performance fell below "an objective standard of reasonableness" under "prevailing professional norms." Id. at 688. The court must apply a "strong presumption of competence" and "affirmatively entertain the range of possible reasons [petitioner's] counsel may have had for proceeding as they did." Cullen v. Pinholster, 131 S. Ct. 1388, 1407 (2011) (citation and internal quotation marks omitted). Second, the petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 698. "The likelihood of a different result must be substantial, not just conceivable." Harrington, 131 S. Ct. at 792.

When ineffective assistance of counsel claims are presented on collateral habeas review, the court assesses them subject to the strictures of AEDPA and must be "doubly deferential" in reviewing the state court's determination that counsel acted effectively. Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (citing Yarborough v. Gentry, 540 U.S. 1, 5-6 (2003) (per curiam)); see 28 U.S.C. § 2254(d). In order to prevail, petitioner must show not only that counsel's performance fell below the Strickland standard of reasonableness, but also that the state court's adjudication of the Strickland standard was itself unreasonable and not merely incorrect. See Harrington, 131 S. Ct. at 785.

Although developed in the context of ineffective assistance of trial counsel claims, the Strickland standard equally applies to claims of ineffective assistance of appellate counsel. Aparicio v. Artuz, 269 F.3d 78, 95 (2d Cir. 2001); Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994). "On appeal, counsel is not required to argue every non-frivolous issue; rather, the better strategy may be to focus on a few more promising issues so as not to dilute the stronger

15

arguments with a multitude of claims. . . . [I]nadequate performance is established only if counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." King v. Greiner, 210 F. Supp. 2d 177, 182 (E.D.N.Y. 2002) (citing Jones v. Barnes, 463 U.S. 745, 751-53 (1983)). A petitioner must prove that there is a reasonable probability that the unraised claims would have succeeded in the state's highest court. Id. at 182-83 (citing Claudio v. Scully, 982 F.2d 798, 803 (2d Cir. 1992)).

Petitioner argues that his appellate counsel was ineffective for two main reasons. First, he contends that, on direct appeal, his appellate counsel should have raised an ineffective assistance of trial counsel claim. Second, he argues that appellate counsel should have raised a newly discovered evidence claim in his N.Y. C.P.L. § 440.40 motion based on an interview report in Monique McLeod's probation file suggesting that she was not employed at the time of the shooting (since she testified that she was coming home late from work).

### Failure to Raise Ineffective Assistance of Trial Counsel Claims

As to petitioner's first claim, petitioner argues that ineffective assistance of trial counsel should have been raised on appeal because trial counsel (a) failed to call two favorable defense witnesses, (b) failed to move for dismissal of the indictment based on the failure of the prosecutor to preserve David Chandler's T-shirt for forensic testing, (c) failed to investigate a "John Doe" arrested and indicted for Chandler's murder before defendant, and (d) failed to pursue a Rodriguez hearing challenging Oglesby's identification. A review of the record demonstrates that the state court reasonably determined that appellate counsel was effective despite not raising these claims. Letters from petitioner's appellate counsel, Jonathan Garelick, to petitioner regarding his N.Y. C.P.L. § 440.10 motion clearly demonstrate that Garelick pursued a reasonable strategy of focusing on petitioner's strongest claim (the McLeod Letter

16

Brady violation) and not diluting that claim with the weaker arguments that petitioner now suggests should have been made. In his letters, Garelick expressed his concern that it would be difficult for petitioner to establish an ineffective assistance of counsel claim because most of trial counsel's decisions would be viewed as strategic and that pursuing this claim might detract from his stronger arguments---for example, the court would focus on trial counsel's performance rather than the prosecutor's deficiencies. See Mem. of Law in Supp. of Writ of Error Coram Nobis, Ex. N, Letter from Jonathan Garelick dated Nov. 7, 2007 ("11/07 Letter"); id., Ex. P, Letter from Jonathan Garelick dated Jan. 25, 2008 ("01/08 Letter"). The strategy pursued by Garelick in the N.Y. C.P.L. § 440.10 was equally applicable on appeal. A review of the ineffective assistance of trial counsel claims that petitioner contends should have been raised on appeal confirms the reasonableness of Garelick's strategy. Trial counsel's decisions regarding investigation and witness presentation are afforded a "strong presumption" that they fell within the "wide range" of reasonable professional assistance. Strickland, 466 U.S. at 689. Particularly given the discretion afforded to trial counsel in making strategic decisions, any ineffective assistance of counsel claim based on trial counsel's investigatory and witness-related choices would have been extremely weak.

First, the testimony that petitioner argues the two additional witnesses would have provided is not clearly exculpatory, as neither of them actually told police that they could identify the shooter or that the shooter was not the petitioner. See Pet. 28. Consequently, trial counsel could reasonably have concluded that their testimony would not be helpful and, if anything, would distract from the testimony of the two defense witnesses who did testify that petitioner was not the shooter and that he had an alibi for the night of the shooting. Trial counsel may also have had concerns about their credibility as witnesses that outweighed any possible

benefit of their testimony. A court reviewing a Strickland claim is "especially deferential to defense attorneys' decisions concerning which witnesses to put before the jury" because such decisions are "typically a question of trial strategy that [reviewing] courts are ill-suited to second-guess." Greiner v. Wells, 417 F.3d 305, 323 (2d Cir. 2005) (citation and internal quotation marks omitted); see also United States v. Best, 219 F.3d 192, 201 (2d Cir. 2000) ("[C]ounsel's decision as to whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation.") (internal quotation marks and citation omitted).

Second, regarding the missing T-shirt, the "John Doe," and Oglesby's identification of petitioner, it could have been reasonable for trial counsel to determine that it was not in petitioner's best interest to pursue these lines of inquiry. Counsel may "make a reasonable decision that makes particular investigations unnecessary," Strickland, 466 U.S. at 691, and "[a]n attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense," Harrington, 131 S. Ct. at 789-90. There was no evidence that the prosecutor or medical examiner ever had Chandler's T-shirt (much less failed to preserve it), and there was no certainty that having the victim's clothing would have helped rather than hurt petitioner's defense. Thus, it was sound trial strategy for counsel to instead highlight the lack of evidence and thoroughly question the medical examiner about the lack of stippling, which would be indicative of a close-range shooting, on Chandler's body. See Tr. 1358-67, 1373-77, 1610-11. Similarly, petitioner fails to show how an investigation into the earlier "John Doe" arrest and a challenge to Oglesby's in-court identification would have yielded favorable results, and trial counsel could have reasonably concluded that petitioner's defense would be better served by instead focusing on the lack of forensic evidence and inconsistencies in the witnesses' testimony.

Petitioner does not explain what exculpatory information might have resulted from investigating the "John Doe" or why Oglesby's identification would have been thrown out. As such, there is no basis for concluding that trial counsel's performance fell below "an objective standard of reasonableness" or that there is a "reasonable probability" that, had counsel taken the course of action suggested by petitioner, "the result of the proceeding would have been different." Strickland, 466 U.S. at 688, 698. For this reason, appellate counsel was not ineffective for declining to raise an ineffective assistance of trial counsel claim on direct appeal, and the state court's decision to that effect was reasonable.

### *Failure to Raise a Newly-Discovered Evidence Claim*

In regards to petitioner's second argument, that appellate counsel was ineffective for failing to raise a newly-discovered evidence claim in petitioner's N.Y. C.P.L. § 440.10 motion, the court first notes that the Supreme Court has previously held that a prisoner has no equal protection or due process right to counsel in state post-conviction proceedings. Pennsylvania v. Finley, 481 U.S. 551, 555 (1987). Petitioner argues that the more recent case Martinez v. Ryan, 132 S. Ct. 1309 (2012), should apply here where the N.Y. C.P.L. § 440.10 motion was arguably the first opportunity petitioner had to raise his newly-discovered evidence claim. However, Martinez was decided on a narrower issue, to wit, "whether a federal habeas court may excuse a procedural default of [a] claim when the claim was not properly presented in state court due to an attorney's errors in an initial-review collateral proceeding." Id. at 1313. The Supreme Court explicitly declined to address the broader constitutional question regarding whether there is a Sixth Amendment right to counsel at what it termed an "initial-review collateral proceeding," that is, a collateral proceeding "which provide[s] the first occasion to raise" a particular claim. Id. at 1315. Petitioner is not claiming ineffective appellate counsel as cause for failure to exhaust

a claim in the state courts, but rather as an independent ground for habeas relief. After <u>Martinez</u>, it is not clear whether such a claim might be available.

Nevertheless, even were such a claim available (and assuming that the § 440.10 motion was petitioner's first opportunity to raise this evidence), the state court was not unreasonable when it held that he had failed to establish that he was denied effective assistance of appellate counsel on this ground. Petitioner relies on a Probation Report, dated August 23, 2001, in which McLeod is reported to have said that she had been suspended from her job in July 2001 because of a drug-related probation offense. <u>See</u> Pet. 31 (citing Mem. of Law in Supp. of Writ of Error Coram Nobis, Ex. L). He argues that this report contradicts her testimony that she was coming home late from work on the night of the murder, and thus should have been raised by appellate counsel in his state collateral attack on petitioner's conviction. In a letter to petitioner, Garelick outlined the basis on which he concluded that it was not in petitioner's best interests to raise this ground in the collateral attack:

> With respect to the probations statement that McLeod indicated that she had been suspended from her job, it is hard to know what to make of this. Even if counsel had access to this document at trial . . . the document standing alone was probably insufficient to prove that McLeod was not working as of August; for example, she could have been reinstated. Thus, while it is true that this undisclosed material might have been useful to attack McLeod's credibility, it is not possible to know, in hindsight, what McLeod would have indicated if she had been confronted with this material. At the end of the day, the claims which <u>are</u> included in the 440 as prepared [are] strong enough that it does not strike me as useful to add additional claims which are not as clear cut.

01/08 Letter. As this letter demonstrates, counsel did not "omit[] significant and obvious issues while pursuing issues that were clearly and significantly weaker." <u>King</u>, 210 F. Supp. 2d at 182. In fact, he reasonably made a determination as to how petitioner's strongest claims could be most forcefully presented in attacking petitioner's conviction. It was not unreasonable for the state court to conclude that such a determination as to which claims to pursue was sound strategy.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is denied. Because petitioner has failed to make a "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the court declines to issue a certificate of appealability. The Clerk of Court is directed to enter judgment accordingly.

SO ORDERED.

/S/ Judge Allyne R. Ross

Allyne R. Ross
United States District Judge

Dated:       November 26, 2013
              Brooklyn, New York

SERVICE LIST

Petitioner:

**Al Fogel**
05A5333
Green Haven Correctional Facility
PO Box 4000
Stormville, NY 12582